## SUMMONS

Attorney(s) _Arthur "Scott" L. Porter, Jr._

Office Address _560 Sylvan Avenue, Suite 3061_

Town, State, Zip Code _Englewood Cliffs, NJ 07632_

Telephone Number _(201) 569-5959_

Attorney(s) for Plaintiff _Dani Bar-David, Michal Bar-David_

_and Octal Corporation_

Plaintiff(s)

Vs.

_Economic Concepts, Inc., et al._

Defendant(s)

# Superior Court of
# New Jersey

| ESSEX | COUNTY |
| LAW | DIVISION |

Docket No: _L-6811-13_

# CIVIL ACTION
# SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf

Clerk of the Superior Court

DATED: _09/06/2013_

Name of Defendant to Be Served: _Pension Strategies, LLC_

Address of Defendant to Be Served: _2141 E. Highland Avenue, Suite 180, Phoenix, AZ 85016_

## Directory of Superior Court Deputy Clerk's Offices
## County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl.,  Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 482-0618
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records,  Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 236-6109
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 691-0494

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(908) 859-4300
LEGAL SERVICES
(908) 475-2010

FISCHER PORTER & THOMAS, P.C.
180 Sylvan Avenue, 2nd Floor
Englewood Cliffs, NJ 07632
(201) 569-5959
(201) 871-4544 fax
*Attorneys for Plaintiffs*

| | |
|---|---|
| DANI BAR-DAVID, MICHAL BAR-DAVID, and OCTAL CORPORATION, | SUPERIOR COURT OF NEW JERSEY ESSEX COUNTY: LAW DIVISION |
| Plaintiffs, | Docket No.: $L$ - $6811$ - $13$ |
| v. | Civil Action |
| ECONOMIC CONCEPTS, INC., KENNETH HARTSTEIN, NATI FINANCIAL, LLC, AMIR ABRAMOV, ARTHUR D. SHANKMAN & CO., ARTHUR D. SHANKMAN, PENSION STRATEGIES, LLC, and DAVID BURKE, | COMPLAINT, DESIGNATION OF TRIAL COUNSEL, RULE 4:5-1 CERTIFICATION AND JURY DEMAND |
| Defendants. | |

Dani Bar-David, Michal Bar-David, and Octal Corporation (collectively "Plaintiffs") hereby file this Complaint against Defendants Economic Concepts, Inc., ("ECI"), Kenneth Hartstein, ("Hartstein"), Nati Financial, LLC, ("Nati"), Amir Abramov, ("Abramov"), Arthur D. Shankman & Co. and Arthur D. Shankman ("Shankman") (collectively "Shankman Defendants"), Pension Strategies, LLC ("Pension Strategies"), and David Burke, ("Burke") (all defendants hereinafter referred to collectively as "Defendants"), and say as follows:

## INTRODUCTION

1.   This case involves a complex and copiously designed insurance scam that finds its genesis and nexus with the Defendants. Individually and through their agents, Defendants branch out to unsuspecting victims that are trying to plan for their future retirement and con them

into purchasing life insurance products disguised as legitimate investment opportunities and quasi-retirement plans. The result is that the insurance agents receive extremely high, front loaded commissions on the insurance scams purported to be investment products, while the victims are left with no investment return and a battle with the IRS due to the illegitimacy of the investment products from the beginning. Here, Plaintiffs are hard working, self employed individuals who own their own business. Octal Corporation is a mechanical parts company that was incorporated in 1990.

2.    As Plaintiffs' business continued to prosper, they started thinking about efficient ways to begin saving for retirement. Unlike many individuals, Plaintiffs did not have access to company retirement plans because they are self employed. Plaintiffs also knew that the social security system was unlikely adequate to provide for their post retirement needs. Plaintiffs had heard of 401k plans, IRAs and similar approved plans, but Plaintiffs realized that as self employed individuals, they would need expert assistance in navigating the morass of information applicable to establishing and maintaining a retirement plan. Therefore, Plaintiffs sought the advice of those who purported to have expertise in these areas. For the Plaintiffs, this was Shankman, Hartstein and Burke.

3.    Plaintiffs were instructed that retirement plans existed that could be established under various sections of the Internal Revenue Code with one such plan being a 412(i) plan. Plaintiffs were also told that one of the biggest insurance and retirement planning companies in the world had worked with certain 412(i) plans to develop insurance products that could meet their needs and be used in these plans to (1) secure retirement needs by generating guaranteed rates of return on the investment and (2) facilitate favorable tax savings. Plaintiffs were told that (1) their investment was safe specifically because it was being managed by a solid, longstanding

insurance company; and (2) they could rest assured that the benefits of the plan were all legitimate since it had been thoroughly reviewed and approved by the Defendants to ensure Plaintiffs' 412(i) plan was in compliance with the applicable laws.

4.      Unfortunately for the Plaintiffs, their purported investment was not legitimate because Defendants perverted the 412(i) provisions of the Internal Revenue Code in an effort to avoid the limitations that the IRS places on retirement savings, the reason being that such limitations would make the plans harder to sell. Defendants promoted the perverted plans so they could generate substantial life insurance sales and fees for administering and designing such plans. The 412(i) plans were no more than well crafted sales gimmicks used by Defendants to disguise what was really happening −that the Plaintiffs were duped into buying large life insurance policies with excessive mortality and expense charges that they would otherwise have never purchased. Plaintiffs were led to believe that 100% of their money was immediately being put to work to generate the minimum guaranteed returns promised, and hopefully even greater returns based on the market, as suggested by Defendants. In truth, a substantial portion of Plaintiffs' initial investment was paid to the sales agents, Shankman, Abramov, Hartstein, and Burke. Such substantial sales commissions tainted the financial advisors with a conflict of interest that was never adequately disclosed to Plaintiffs.

5.      Not only were Plaintiffs misled to believe that their contributions would continue to grow, they were also told that said contributions were business deductions pursuant to the Internal Revenue Code. However, the applicable code Section 162 of the Internal Revenue Code limits business deductions to those that are ordinary and necessary. This provision of the Internal Revenue Code has been in existence since the Code was created and applies to any retirement plan.    While there are other limitations applicable to business deductions for

- 3 -

contributions to retirement plans, all such contributions must be an ordinary and necessary business expense in order to be tax deductible. If a person simply contributes money from his business to a retirement plan with no corresponding business reason, then the contribution is considered a non-deductible dividend that cannot be deducted by the business, and therefore must be included as income by the business owner. Despite this overriding limitation of retirement plan contributions, Defendants simply ignored the provision and instead focused exclusively on other Internal Revenue Code provisions, and their warped interpretation thereof, to justify the purported tax benefits being touted to Plaintiffs.

6.   Plaintiffs were told that there were no limitations on the amount of money that they could contribute to these retirement plans. Plaintiffs were told that they could just contribute for the owners of the business and that there was no requirement that all employees of the business participate.   Plaintiffs were told that because insurance policies were being used as the investment vehicle, they could withdraw money from the plan tax free by taking policy loans that would never have to be repaid. All of these purported tax benefits were illusory in that they never really existed. And IRC 162 was an overriding limitation to the tax deductibility of the retirement plan contributions that was simply ignored by the Defendants when selling the plan to Plaintiffs.

7.   There is nothing new or surprising about the 412(i) plans as they have been in existence since the 1970's. A legitimate 412(i) plan is known as a defined benefit pension plan funded with a combination of life insurance policies and annuities. The 412(i) plan is adopted and sponsored by small business owners because it relieves the owners of the burden of hiring an actuary to manage the plan's funding levels. Such plans can only be funded via fully guaranteed annuities or a combination of annuities and life insurance. A 412(i) plan is a defined benefit

- 4 -

pension plan created under Section 412(i) of the Internal Revenue Code (the "Code").[1]  Like any defined benefit pension plan, a 412(i) plan provides certain retirement and death benefits to its participants and must contain assets sufficient to pay those benefits.  Code section 412(i) and the Treasury Regulations provide specific requirements that dictate how annuities and life insurance may fund the plan.

8.     To create a 412(i) plan, an employer first adopts a plan document and then establish a trust to hold the plan's assets, and the trust uses employer contributions to purchase and maintain some combination of life insurance policies *and* annuities for the 412(i) plan.  Treasury Regulations prohibit a pension plan from providing any benefits – such as death benefits – that are more than "incidental" to the retirement benefits under the plan.  Otherwise it is no longer a retirement plan, but an insurance plan.[2]

9.     The employer funds the 412(i) plan by making regular cash contributions to the trust at least equal to the amount of the premiums due on the insurance policies and annuities, and the Code allows the employer to take a tax deduction in the amount of these contributions.  As the plan participants retire, revenue stream from the insurance pays the specified retirement benefit to plan participants.

10.    Scams involving 412(i) plans have been prevalent since Defendants first began marketing the plans.  Promoters for 412(i) pension plans trained its agents, in this case Hartstein, Burke, Abramov and Shankman, to mislead Plaintiffs by providing false marketing for the plans that represented the plans as a legitimate tax-deductible retirement plan with benefits that include (1) tax deferred earnings; (2) larger contributions than traditional plans; (3) availability of short-term tax-free loans against the policy that did not have to be repaid; (4) only a five year

---

[1] Section 412(i) was recodified as 26 U.S.C. § 412(e)(3) in the 2006 amendments to the Code.

[2] Treas. Reg. § 1.401-1(b)(I)(i).

- 5 -

commitment to the plan; and (5) the ability to buy the insurance policy out of the plan without causing a prohibited transaction and incurring excise tax liability. Defendants shared in extremely high commissions at the expense of Plaintiffs. In addition, Defendants failed to comply with non-discrimination laws by promoting the plans only to the highest compensated employees and suggesting employers "carve out" highly compensated employees and owners into separate corporate entities. Despite regulations, Defendants ensured that the plans were funded entirely by certain types of life insurance policies that contained a feature that suppressed the cash value of the policies in the early years. This caused the unsuspecting consumers of the 412(i) plans to defraud the IRS of income tax, because the type of insurance policy allowed removal of a large portion of the funds in the plan on a pre-tax basis. In response to these scams, the IRS deemed the plans to be abusive tax shelters in 2004 and made participation in a 412(i) plan a listed transaction, requiring consumers who had a 412(i) plan to report this fact to the IRS by filing a Form 8886. There is no doubt that Defendants were familiar with the IRS regulations that governed the 412(i) plans and chose to turn a blind eye. There is no doubt that Defendants had legal compliance departments and attorneys determine that the plans had features that made them non-compliant under sections 412(i) and 162. Finally, there is no doubt that Defendants actively participated in the design of a type of life insurance policy that would facilitate the marketing of the 412(i) plan; maximize commission payments to insurance agents; and further the large contribution/tax avoidance nature of the 412(i) arrangement in a manner that was not apparent to the consumer.

11.  Interestingly, one of the selling points of the 412(i) plan is that large nationally-known insurance companies guarantee all benefits. The fact is that 412(i) plans have long been under attack by the IRS because insurance companies were overfunding them with "springing

cash value" policies, like the one used in this case. Defendants were well aware of the risk of the 412(i) plans for the consumers. Defendants strategically trained its agents, such as Hartstein, Shankman, Abramov, and Burke, to sell the plan, but ignore the risk. Defendants provided the marketing materials to sell the scam and used its insurance policies to fund the scam. None of the materials depicted any level of risk for the consumers, only benefits. Because the Plaintiffs had no prior knowledge of how 412(i) plans worked, they relied on the representations of Burke, Shankman, Abramov, and Hartstein. Knowing that the Plaintiffs were new to 412(i) plans, Defendants kept very strict control over the plan and its documents, showing the Plaintiffs only what they wanted them to see. The Plaintiffs were wrongfully instructed that it was perfectly legal for 100% of the premiums they paid into the 412(i) Plan to be deducted as a business expense. The reality of the investment is that the Plaintiffs will never see a return on their investment, they have lost their retirement benefits; and they have been left with an IRS audit that resulted in the Plaintiffs paying back taxes, penalties, excise taxes and interest caused by the defective 412(i) plan created and sold by the Defendants. The scam was perpetuated because nobody informed Plaintiffs that the entire plan was a listed transaction that warranted special tax preparation. The reality is that Defendants worked together to dupe the Plaintiffs into participating in a seemingly qualified 412(i) Plan that, in reality, was overfunded. Also, from its inception, the 412(i) Plan sold to the Plaintiffs violated the benefits rights and features requirements of the Internal Revenue Code and was considered by the IRS to be deferred compensation rather than tax deductible premiums. The fact is the 412(i) plan sold to the Plaintiffs was never compliant with the Internal Revenue Code from the very day it was created much less sold.

12.   In addition to making affirmative misrepresentations to induce the Plaintiffs into believing they were putting their money in a guaranteed investment that provided security, retirement planning, tax benefits, and was IRS compliant, Defendants failed to disclose material facts to Plaintiffs, including, *inter alia*,:

- That a substantial percentage of the money invested by Plaintiffs was used to pay exorbitant commissions to the sales agent;

- That the 412(i) Plan would be funded with insurance policies that the IRS considered to be "springing cash value" policies that in turn would cause scrutiny of the Plan by the IRS;

- That Plaintiffs were legally able to fund only sufficient insurance to provide an incidental death benefit as defined by the Treasury Regulations;

- That Plaintiffs' investment in the defective 412(i) Plan would virtually guarantee that they would be audited by the IRS, that they would incur substantial expenses in defending the audit and that they would ultimately lose the audit and not only have to pay taxes on the sums previously invested, but also interest and penalties;

- That the 412(i) Plan would be vastly over-funded subjecting the sponsoring employer to huge excise taxes for the first five to 10 years of the plan's existence;

- That the retirement benefits provided by the life insurance policies did not match the retirement benefit provided by the plan and therefore the plan was disqualified from treatment as a 412(i) plan under the Code upon adoption;

- That the insurance policies provided optional forms of benefits that the plan did not provide, and vice versa, which disqualified the plan from treatment as a 412(i) plan under the Code upon adoption;

- That insurance policies could be used to fund benefits only for owners and highly compensated employees, which violated the benefits, rights and features rules under the Code, disqualifying the 412(i) Plan from all qualified pension plan rules thereby rendering the plan a deferred compensation arrangement from its inception;

- That the IRS perceived these types of plans as abusive tax shelters

- 8 -

and not compliant with 412(i) and that the IRS was not going to allow the deduction to the contribution into these types of plans;

• That for decades the courts have supported the position of the IRS that contributions to 412(i) plans or similar plans are not an ordinary and necessary business expense deductible under IRC §162;

• That the insurance policy loan/sale transaction contemplated after the fifth year of funding is a prohibited transaction that subjects the interested/disqualified parties to the transaction to an excise tax for each year in which the transaction is not corrected;

• That the federal tax authorities prevent an employer from sponsoring a pension plan with the pre-conceived intention of terminating the plan;

• That contributions made to these types of plans are deemed disguised (constructive) distributions of income that are not deductible by the company and that must also be reported as income by the individual recipients; and

• That certain Defendants had their team of lawyers vetted the plans before the sale of these plans and determined that they did not comply with the Internal Revenue Code Regulations.

13. Plaintiffs bring this action to recover for the misrepresentations and omissions that initially induced Plaintiffs into participating in the investment and to continue participating in such investment year after year.

## PLAINTIFFS

14. Plaintiff Dani Bar-David is an individual citizen of the State of New Jersey.

15. Michal Bar-David is an individual citizen of the State of New Jersey.

16. Plaintiff Octal Corporation is a corporation with its principal place of business in New Jersey.

## DEFENDANTS

17.   Defendant Economic Concepts, Inc. is an Arizona corporation and has a principal place of business located at Raintree Office Park II, 9316 East Raintree Drive, Suite 100, Scottsdale, AZ 85260.

18.   Defendant Kenneth Harstein is a resident of the State of Arizona and has a business address at Raintree Office Park II, 9316 East Raintree Drive, Suite 100, Scottsdale, AZ 85260.

19.   Defendant Arthur D. Shankman & Company Inc. is a financial services company incorporated in Missouri. It does business in New Jersey and has a business address at Arthur D. Shankman & Company Inc., 101 Eisenhower Pkwy., Roseland, New Jersey 07068.

20.   Defendant Arthur D. Shankman is an individual and non-resident of the State of New Jersey. He does business in New Jersey and has a business address at Arthur D. Shankman & Company Inc., 101 Eisenhower Pkwy., Roseland, New Jersey 07068.

21.   Defendant Pension Strategies, LLC is a financial services company incorporated in Arizona, and has a principal place of business located at Pension Strategies, LLC, 2141 E. Highland Avenue, Suite 180, Phoenix, AZ 85016.

22.   Defendant Amir Abramov is a resident of the state of New Jersey, who does business in New Jersey and has a business address at Nati Financial, LLC, 239 New Road, Bldg. C, Suite 1, Parsippany, New Jersey 07054.

23.   Defendant Nati Financial, LLC is a financial services company incorporated in the state of New Jersey, doing business in New Jersey, and has a principal place of business at Nati Financial, LLC, 239 New Road, Bldg. C, Suite 1, Parsippany, New Jersey 07054.

24.   Defendant David Burke is a resident of the State of Arizona, and has a business address at Pension Strategies, LLC, 2141 E. Highland Avenue, Suite 180, Phoenix, AZ 85016.

- 10 -

25. All of the Defendants have done business in and conducted torts in the State of New Jersey, which give rise to Plaintiffs' claims.

## AGENCY

26. Unless otherwise stated herein, whenever it is alleged in this pleading that Defendant Economic Concepts, Inc. committed an act, made a representation or statement, failed to perform an act, or failed to make a statement, it means that Defendant Economic Concepts, Inc. was acting or failing to act through its authorized agents, partners and/or employees, including but not limited to Kenneth Hartstein, who was acting with either express, implied, apparent and/or ostensible authority and that Economic Concepts, Inc. subsequently ratified and benefited financially from these acts, failures to act, representations, statements or conduct.

27. Unless otherwise stated herein, whenever it is alleged in this pleading that Defendant Arthur D. Shankman & Company Inc. committed an act, made a representation or statement, failed to perform an act, or failed to make a statement, it means that Defendant Arthur D. Shankman & Company Inc. was acting or failing to act through its authorized agents, partners and/or employees, including but not limited to Arthur D. Shankman, who was acting with either express, implied, apparent and/or ostensible authority and that Defendant Arthur D. Shankman & Company Inc. subsequently ratified and benefited financially from these acts, failures to act, representations, statements or conduct.

28. Unless otherwise stated herein, whenever it is alleged in this pleading that Defendant Pension Strategies, LLC committed an act, made a representation or statement, failed to perform an act, or failed to make a statement, it means that Defendant Pension Strategies, LLC was acting or failing to act through its authorized agents, partners and/or employees, including but not limited to David Burke, who was acting with either express, implied, apparent and/or

- 11 -

ostensible authority and that Defendant Pension Strategies, LLC subsequently ratified and benefited financially from these acts, failures to act, representations, statements or conduct.

29.  Unless otherwise stated herein, whenever it is alleged in this pleading that Defendant Nati Financial, LLC committed an act, made a representation or statement, failed to perform an act, or failed to make a statement, it means that Defendant Nati Financial, LLC was acting or failing to act through its authorized agents, partners and/or employees, including but not limited to Amir Abramov, who was acting with either express, implied, apparent and/or ostensible authority and that Defendant Nati Financial, LLC subsequently ratified and benefited financially from these acts, failures to act, representations, statements or conduct.

30.  Each of the Defendants aided and abetted each other in the commission of the tortious acts of which Plaintiffs complain. Each of the Defendants was a co-conspirator, and knowingly aided and abetted the wrongful acts of each other. Each Defendant is therefore jointly and severally liable without reduction for proportionate responsibility for all damages sustained by Plaintiffs.

## JURISDICTION AND VENUE

31.  Subject matter jurisdiction is properly vested in this Court.

32.  This Court also has personal jurisdiction, both general and specific, over Defendants. All Defendants have purposefully availed themselves of the privileges and benefits of conducting business in New Jersey, have entered into contracts with New Jersey residents either relating to the transactions at issue in this case or substantially similar transactions, have engaged in substantial business transactions with New Jersey residents in connection with Plaintiffs' investment or substantially similar investments and as such, are subject to personal jurisdiction in this State. All Defendants have: (a) contracted by mail or otherwise with New

Jersey companies, which contracts were to be performed in whole or in part in New Jersey; (b) Defendants committed torts or violated New Jersey statutes, which are the subject of this action, in whole or in part in New Jersey; and (c) otherwise transacted business in New Jersey in such a manner as to make them subject to the jurisdiction of a New Jersey Court.

33.   Plaintiffs are not making a claim or cause of action that pertains to a federal question. The plan at issue was not an ERISA Plans and therefore ERISA does not apply to this lawsuit.

34.   Venue is proper in Essex County pursuant to N.J. Ct. Rule 4:3-2 because the Shankman Defendants maintain a location in Essex County, New Jersey where they do business within the State of New Jersey.

35.   Venue is proper in Essex County, New Jersey as to all Defendants pursuant to N. J. Ct. Rule 4:3-2 because venue is proper in Essex County, New Jersey as to at least one Defendant and all claims and actions arise out of the same series of transactions and occurrences.

## BACKGROUND

36.   Defendants sell insurance under the marketing of defined benefit pensions plans known as 412 plans. A 412(i) plan was marketed to be a better option than a standard 412 plan because the contributions to the plan have a much higher cap.  Like standard 412 plans, 412(i) plans provide retirement and death benefits to its participants but the Code requires the funding for 412(i) plans to consist of life insurance policies and annuities.

37.   The 412(i) plans have long been under scrutiny by the IRS based on the fact that insurance agents, promoters, and designers often take a legitimate, qualified plan and make it a listed transaction by, *inter alia*, over funding the plan and using "springing cash value" policies. Basically insurance agents sell 412(i) plans under the disguise that the participant must fund the

- 13 -

plan for five years and then will be able to purchase the life insurance policies after that time because they will still have a low cash value at the time of purchase. Once owned by the participant (as opposed to the plan) the value of the policies spring in value thus generating accessible retirement funds that were funded "tax free" and will be accessible "tax-free". Unknown to Plaintiffs, the reality is that the majority of initial premiums paid by the participants are paid to the sellers in commissions. Additionally, the IRS considers these "springing cash value" policies to be nothing more than an attempt to defer compensation. Therefore, the IRS considers 412(i) plans with "springing cash value" policies to be a listed transaction and requires special tax preparation in the form of a Form 8886 to be filed for all years the participant is enrolled in the plan.

38.    Defendants took a calculated approach to selling these plans because they did not want to bear the risks that the consumers would ultimately bear. Despite receiving intel from various sources that 412(i) plans would not pass muster with the IRS and the participants would be at risk with the IRS for their participation in the plan, Defendants charged forward selling 412(i) plans to unsuspecting consumers, such as Plaintiffs. Defendants refrained from disclosing the potential tax risks with the clients. Defendants wanted to make sure they could sell the benefits of the plan, omit the risks, and absolve itself from any liabilities. In the end, hard-working people like the Plaintiffs gave Defendants their money and have recovered a fraction of their initial investment. All the while, all those who helped facilitate these plans got paid in a big way, at the expense of the everyday people that were merely trying to secure a future.

## FACTS

A.    The Shankman Defendants, Abramov, and Nati Financial, LLC's Involvement

- 14 -

39.  Dani Bar-David knew Amir Abramov since approximately 1997. Abramov handled most of Dani Bar-David's insurance needs, as well as some of his retirement and investment needs. In approximately September or October of 2003, Abramov suggested that Dani Bar-David meet with Arthur Shankman, an attorney and financial planning expert who could assis Dani Bar-David in saving for retirement in a tax favored way. Shortly thereafter, Abramov set up a meeting with Dani Bar-David, Shankman and himself at Dani Bar-David's office.

40.  Arthur D. Shankman, individually and on behalf of Arthur D. Shankman & Co., and Abramov, individually and on behalf of Nati Financial LLC solicited Plaintiffs Dani Bar-David and Octal Corporation's (collectively "Bar-David") participation a 412(i) Plan.  Abramov introduced Shankman as the expert in 412(i) plans and Shankman presented himself an expert in the 412(i) arena.   Dani Bar-David engaged Defendants Shankman and Abramov to be his financial advisors. From late 2003 on, Dani Bar-David viewed Defendants Shankman and Abramov as his trusted financial advisors – his fiduciaries. Dani Bar-David trusted Defendants Shankman and Abramov, not only with his money, but with his family's financial well-being. Dani Bar-David depended on Defendants Shankman and Abramov's advice so that he would have the ability to provide for his family in the years to come.

41.  In addition to the first meeting and until Dani Bar-David implemented the 412(i) Plan on November 17, 2003, Defendants Shankman and Abramov met with Plaintiffs at Dani Bar-David's office five to six more times to solidify Plaintiffs' participation in the 412(i) plan. During  Shankman and Abramov's presentations of the 412(i) plan, Shankman and Abramov represented to the Plaintiffs that the 412(i) Plan had the following benefits and features:

> a.    The 412(i) Plan was a tax advantaged retirement investment that would provide benefits including a death benefit;
>
> b.    The 412(i) Plan would be paid for in five (5) years of contributions;

- 15 -

    c.    The contributions to the 412(i) Plan are 100% tax deductible;

    d.    The 412(i) Plan was a safe investment with no risk;

    e.    The 412(i) Plan was compliant with the Internal Revenue Code and IRS regulations and had been approved by the IRS;

    f.    The investment in the 412(i) Plan was guaranteed to grow at a minimum rate of return of 5%; and

    g.    Plaintiffs could have access to their investment after ten (10) years at which time Plaintiffs could withdraw their money tax-free.

42.    The general course of all telephone conversations and all face-to face meetings with Defendants Shankman and Abramov was that if Defendant Shankman said something or made a representation, Defendant Abramov would then confirm exactly what Defendant Shankman had said. If Defendant Abramov said something or made a representation, Defendant Shankman would then confirm exactly what Defendant Abramov had said. The two spoke equally through the whole sales process – although Shankman claimed to be more well-versed, not only in financial planning and estate planning, but in 412(i) plans specifically. Shankman held himself out to be experts in 412(i) Plans. Plaintiffs relied on Defendant Shankman and Defendant Abramov's self-proclaimed expertise.

43.    As a result of Shankman and Abramov's representations and omissions (described more thoroughly below), the Plaintiffs entered into the 412(i) Plan. A life insurance policy was issued to the Octal Corporation Defined Benefit Pension Plan (the "Plan") on the life of Dani Bar-David.    The insurance policy was the investment vehicle utilized to fund the 412(i) Plan.

44.    The Plaintiffs entered into the Octal Corporation Defined Benefit Plan on or about November 17, 2003. The Plaintiffs then made the following contributions to the Plan:

$200,359.00 in 2003, $200,359.00 in 2004, $200,359.00 in 2005, $200,359.00 in 2006 and $200,359.00 in 2007. The Plaintiffs' contributions to the 412(i) Plan totaled $1,001,795.00.

45.     Upon information and belief, approximately 90% of Plaintiffs' first year contribution to the 412(i) Plan went to pay commissions to Shankman and Abramov. Shankman and Abramov were well aware that the Plan was being used to commit fraud and generate substantial life insurance sales when they sold it to the Plaintiffs and knowingly accepted their commissions from the sale of the Plan.

46.     Additionally, when the issue of Octal employees being included in the 412(i) Plan was raised in late 2005, Shankman provided a waiver form to Octal and instructed Bar-David that it would benefit him if Octal employees waived their right to be involved in the plan. Bar-David followed Shankman's advice and had his employees sign such waivers.

47.     In addition to the affirmative misrepresentations that Defendants Shankman and Abramov made to Plaintiffs regarding the 412(i) Plan, and as further evidence of Defendants Shankman and Abramov's intent to deceive Plaintiffs, Defendants Shankman and Abramov knew of the following material facts and intentionally failed to disclose to Plaintiffs, *inter alia*, the following material facts:

- That a substantial percentage of the money invested by Plaintiffs was used to pay their exorbitant commissions and that virtually all of the money invested during the first year was immediately lost because of this;

- That the 412(i) Plan would be funded with insurance policies that the IRS considered to be "springing cash value" policies which in turn would cause scrutiny of the Plan by the IRS;

- The insurance was being paid for by Plaintiffs – *but owned by the plan*;

- That Plaintiffs were only legally able to fund only sufficient insurance to provide an incidental death benefit as defined by the

- 17 -

Treasury Regulations;

- That the 412(i) Plan was a highly risky investment for the Plaintiffs;

- That Plaintiffs' investment in the defective Plan would virtually guarantee that they would be audited by the IRS, that they would incur substantial expenses in defending the audit and that they would ultimately lose the audit and not only have to pay taxes on the sums previously invested, but also interest and penalties;

- That the IRS perceived these type of plans as abusive tax shelters and not compliant with IRC 412(i) and that the IRS was not going to allow the deduction to the contribution into these types of plans;

- That the IRS viewed these types of plans as "listed transactions;"

- That for decades the courts have supported the position of the IRS that contributions to 412(i) plans are not a ordinary and necessary business expenses deductible under IRC §162;

- That the federal tax authorities prevent an employer from sponsoring a benefit plan with the pre-conceived intention of terminating the plan;

- That contribution made to these type of plans are deemed disguised (constructive) distributions of income that are not deductible by the company and that must also be reported as income by the individual recipients; and

- That the Plaintiffs would in all reasonable likelihood never achieve the economic results as represented during the sale.

48.    As financial advisors with self-proclaimed expertise in the area of 412(i) plans, Defendants Shankman and Abramov knew of the IRS' position on 412(i) plans. They knew all of the facts above in paragraph 47 and they intentionally did not disclose them to Bar-David. They knew the IRS' position on 412(i) plans was unfavorable and that the IRS would, in all reasonable probability, determine that the 412(i) Plan was a "listed transaction." Defendants Shankman and Abramov knew that 412(i) plans posed substantial tax risks to Plaintiffs and were

considered extremely aggressive. Defendants Shankman and Abramov knew that the tax deduction on the contributions were limited to Section 162. Defendants Shankman and Abramov knew that up to 90% of the first year contribution would be paid as commissions. Thus Defendants Shankman and Abramov intentionally deceived Plaintiffs by actively promoting and encouraging Plaintiffs' participation in the 412(i) Plan, while egregiously omitting the significant tax risks associated with such a plan. Furthermore, Defendants Shankman and Abramov intentionally failed to disclose the Section 162 limits and high front end commission to Bar-David because, had he made those disclosures, Bar-David would never had invested into the 412(i) Plan. Plaintiffs relied on the intentional oral and written misrepresentations of Defendants Shankman and Abramov and invested in 412(i) Plan to their detriment.

49.     On or about November 17, 2003, at a face-to-face meeting, Defendants Shankman and Abramov both presented Plaintiffs with the paperwork that was purportedly necessary to implement the 412(i) Plan. However, hidden in the ream of paperwork that Plaintiffs were to sign was a false and fraudulent disclaimer, containing legalese and fine print, purporting to disclaim that Defendants Shankman and Abramov had said any of the things that they had actually said in order to secure the sale. Defendants Shankman and Abramov's failure to alert Plaintiffs to such a document is further evidence of their intent to deceive Plaintiffs and their breach of the fiduciary duties owed to Plaintiffs.

## B.     Hartstein, ECI, Burke and Pension Strategies' Involvement

50.     The 412(i) Plan that was selected by Shankman and Abramov and sold to the Octal Plaintiffs was designed and drafted by Ken Hartstein and Economic Concepts, Inc. David Burke and Pension Strategies, LLC administered the Octal Plan.

- 19 -

51.     Hartstein, ECI, Burke and Pension Strategies knew from its inception that the Plan was not a valid and compliant 412(i) plan. They knew that based on the representations and advice provided to Plaintiffs by them and their agents that Plaintiffs would deduct 100% of their contribution amounts every year on the Octal Corporation federal income tax return. Hartstein, ECI, Burke and Pension Strategies knew that there would be no record of Form 5330's being submitted or disclosing the excess contributions and they further knew that the Plaintiffs would not pay excise tax on excess contributions because they had advised Plaintiffs to the contrary. These issues were known to all Defendants Hartstein, ECI, Burke and Pension Strategies from the very beginning, because they drafted and administered the PENdulum Plan, that was determined by the IRS to be a "listed transaction."

52.     Moreover, from its inception, the Plan had the following disqualification defects that were known to the Defendants Hartstein, ECI, Burke and Pension Strategies, but were unknown to the Plaintiffs:

a.      Failure to include individuals who are employees or members of a controlled group of corporations—and therefore failure to adhere to minimum participation requirements and rules prohibiting discrimination in favor of highly compensated employees [Code §§ 401(a)(3), 401(a)(4), 414];

b.      Discrimination in benefits, rights and features in violation of Code section 401(a)(4) because non-highly compensated employees do not have life insurance they only have annuities funding benefits;

c.      Failure to fund the Plan within maximum funding and contribution limitations set by Code sections 404, 412, and 415 because the accelerated cost structure of the life insurance policies results in the making and deduction of excess contributions;

d.      Failure to follow the Code provisions applicable to Code section 412(i) (now Code section 412(e)(3)) which requires level contributions and that proceeds from annuities and insurance match the benefit value at normal retirement age; and

e.      Failure to follow the incidental death benefit limitations as stated in relevant Revenue Rulings.

- 20 -

Clearly, from its inception the 412(i) Plan was not a valid and compliant 412(i) plan and was a "listed transaction", and the Defendants knew, or should have known, that the Plaintiffs' 412(i) Plan had the above referenced defects because they drafted and funded the Plan knowing the parameters of the IRS rules, rulings, and regulations.

53. In addition to the conduct described above and as further evidence of Defendants Hartstein, ECI, Burke and Pension Strategies' intent to deceive Plaintiffs,, Defendants Hartstein, ECI, Burke and Pension Strategies knew of the following material facts and intentionally failed to disclose to Plaintiffs, *inter alia*, the following material facts:

- That a substantial percentage of the money invested by Plaintiffs was used to pay their exorbitant commissions and that virtually all of the money invested during the first year was immediately lost because of this;

- That the 412(i) Plan would be funded with insurance policies that the IRS considered to be "springing cash value" policies which in turn would cause scrutiny of the Plan by the IRS;

- The insurance was being paid for by Plaintiffs – *but owned by the plan*;

- That Plaintiffs were only legally able to fund only sufficient insurance to provide an incidental death benefit as defined by the Treasury Regulations;

- That the 412(i) Plan was a highly risky investment for the Plaintiffs;

- That Plaintiffs' investment in the defective Plan would virtually guarantee that they would be audited by the IRS, that they would incur substantial expenses in defending the audit and that they would ultimately lose the audit and not only have to pay taxes on the sums previously invested, but also interest and penalties;

- That the IRS perceived these type of plans as abusive tax shelters and not compliant with IRC 412(i) and that the IRS was not going to allow the deduction to the contribution into these types of plans;

- That the IRS viewed these types of plans as "listed transactions;"

- 21 -

- That for decades the courts have supported the position of the IRS that contributions to 412(i) plans are not a ordinary and necessary business expenses deductible under IRC §162;

- That the federal tax authorities prevent an employer from sponsoring a benefit plan with the pre-conceived intention of terminating the plan;

- That contribution made to these type of plans are deemed disguised (constructive) distributions of income that are not deductible by the company and that must also be reported as income by the individual recipients; and

- That the Plaintiffs would in all reasonable likelihood never achieve the economic results as represented during the sale.

## C.   The Fall Out

54.   As a result of having been induced into the Plan, through the misrepresentations and omissions of Defendants, Plaintiffs have suffered damages.  In addition to the contributions of $1,001,795.00, Plaintiffs also suffered losses as a result of having to retain tax counsel and pay in excess of $57,500.00 in attorney and $8,974.00 in actuarial fees to terminate their 412(i) Plan.  In addition to the contribution and professional fees, other damages incurred by the Plaintiffs include but are not limited to the following:

a.   Lost investment opportunity;

b.   Cost of life insurance they would not have purchased, but for their purchase of the Plan based on the Defendants' misrepresentations and omissions;

c.   Administration costs associated with adoption and operation of the Plan;

d.   Adverse tax consequences for participating in a "listed transaction;" and

e.   Liability exposure to the omitted employees.

55. All told Defendants represented to the Plaintiffs that all their transactions had the blessing of the IRS. In truth, the 412(i) Plan was not a legitimate transaction in the eyes of the IRS.

56. The IRS made the following assessment against Plaintiffs: 1) back taxes against Dani and Michal Bar-David for 2006 and 2007 in the amount of $119,361.00; 2) accuracy-related penalties against Dani and Michal Bar-David for 2006 and 2007 in the amount of $21,786.00; 3) interest against Dani and Michal Bar-David for 2006 and 2007 in the amount of $22,254.00; 4) 6707A penalties against Dani and Michal Bar-David for 2006 and 2007 in the amount of $89,521.00; 5) 6707A against Octal Corporation for 2006 and 2007 in the amount of $20,000.00; and 6) excise taxes against Octal Corporation for 2006 and 2007 in the amount of $78,638.00.

57. Absent Defendants' misrepresentations and omissions, Plaintiffs could have invested the entire $1,001,795.00 into legitimate retirement plans, achieved legitimate tax benefits and made a substantial return on the investment.

58. In addition, the failure of this investment and the tax consequences associated with it, along with the risk of exposure to the IRS, has caused the Plaintiffs to have physical manifestations of personal injury and to suffer mental anguish.

## DISCOVERY RULE

59. Plaintiffs hereby affirmatively plead the discovery rule and would show that Plaintiffs' claims are not barred by limitations and accrued only when Plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered the facts giving rise to their causes of action. This suit is brought within six years of when Plaintiffs knew or should have known of the existence of the causes of action described above.

60. Plaintiffs did not discover that Defendants had engaged in the false, misleading, or deceptive acts or practices set forth above until long after their improper conduct began. Nor should Plaintiffs have discovered such acts or practices prior to that time. Defendants' false, misleading, or deceptive acts or practices related to a variety of complex legal and/or tax issues, which were well beyond the knowledge and understanding of Plaintiffs. For that reason, Plaintiffs justifiably relied on the advice and expertise of Defendants.

61. In addition, Defendants fraudulently concealed their wrongdoing from Plaintiffs. Despite having actual knowledge that they had engaged in false, misleading, or deceptive acts or practices, Defendants concealed their wrongdoing from Plaintiffs by making misrepresentations and/or by remaining silent when they had a duty to disclose such wrongdoing to Plaintiffs. Defendants had a fixed purpose to conceal their wrongdoing. Plaintiffs reasonably relied on the above-referenced misrepresentations and/or silence to their detriment.

### FIRST CAUSE OF ACTION
### FOR FRAUD UNDER STATE LAW
### (BY PLAINITFFS AGAINST ALL DEFENDANTS)

62. Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

63. Defendants, individually and through their agents, and in conspiracy with one another, and aiding and abetting each other knowingly made false representations to or concealed material facts from Plaintiffs with the intention that Plaintiffs rely thereon in transacting their business affairs. Defendants, and each of them, sold an investment to Plaintiffs based on fraudulent representations as to the nature of the investment as described above. Defendants made (1) representations; (2) the representations were false; (3) Defendants knew they were false; (4) the representations were made with the intent to deceive; and (5) the plaintiffs

- 24 -

justifiably relied on the representations, which resulted in damages. Specifically, with respect to the Plan sold to the Plaintiffs, Defendants intentionally made or caused to be made, *inter alia*, the following material misrepresentations or misleading statements to Plaintiffs:

a.  The biggest advantage of the 412(i) Plan is that the contributions into the plans are 100% tax deductible.

b.  The 412(i) Plan was approved by the IRS and complied with all applicable tax laws and regulations.

c.  The 412(i) Plan is a safe and legitimate way to save for retirement.

d.  The principal of Plaintiffs' contributions into their 412(i) Plan would always be safe and could never be lost.

e.  Plaintiffs' investment would grow at a minimum rate of return of 5%.

f.  The money the Plaintiffs take out of the 412(i) Plan after ten years is "tax free".

g.  The Plaintiffs' 412(i) Plan provided life insurance as an "extra benefit"

h.  A 412(i) plan was like a retirement plan and the contributions were considered by the IRS to be an ordinary and necessary business expense.

i.  The money invested in the 412(i) plan was "tax-free in" and "tax-free out"

j.  Plaintiffs principal investment would always be protected and the benefits would be guaranteed by the insurance company.

k.  The accumulated growth on Plaintiffs' contributions is tax deferred as well.

l.  The 412(i) Plan was properly designed.

64.  However, Defendants were aware of the falsity of the above misrepresentations and knew that the IRS was scrutinizing these types of plans, thus they were not a low-risk retirement investment as Defendants represented them to be.

- 25 -

65. Alternatively, Defendants made these representations and omissions as a positive assertion, recklessly, without any knowledge of their truth, and with a conscious disregard of the rights and interests of Plaintiffs, and for the purpose of enriching themselves and jeopardizing the financial well being of Plaintiffs. Defendants acted maliciously, oppressively, and with the intent to defraud Plaintiffs. Defendants made these misrepresentations with the intention that they should be acted upon by Plaintiffs. Plaintiffs acted in reliance upon Defendants' misrepresentations and thereby suffered injury.

66. Additionally, Defendants intentionally failed to disclose, *inter alia,* the following material facts to Plaintiffs, as well as the others described above:

    a.    The Plaintiffs' 412(i) Plan was a "listed transaction";

    b.    The Plaintiffs' 412(i) Plan did not comply with the Internal Revenue Code;

    c.    The Plaintiffs' 412(i) Plan would likely be attacked by the IRS;

    d.    The Plaintiffs' contributions to the Plan were not tax deductible;

    e.    The Plaintiffs should shut down their original plan and not make any further contributions into it and should not contribute to any future 412 plans;

    f.    The Plaintiffs will owe income tax on their contributions to the 412(i) Plan.

    g.    That the IRS perceived 412(i) plans that were used as a means of selling large life insurance policies as abusive tax shelters and that the IRS was not going to allow the deduction of the contribution into these plans;

    h.    The fact that a substantial percentage of the "plan contributions" were used to pay commissions to the insurance agents and that virtually all of the money invested during the first year was immediately lost because of this;

    i.    That contributions paid into a 412(i) plan would not be considered a ordinary and necessary business expense by the IRS.

    j.    That the IRS would in all reasonable probability assess substantial penalties and interest;

      k.      That the Plaintiffs would in all reasonable likelihood never achieve the economic results as represented during the sale; and

      l.      That when the taxes were due, the Plaintiffs would not be able to access the very funds that were invested and that generated the taxable event so that they would then not only lose the sums invested, but would have to access other funds in order to pay the IRS and pay their lawyers to defend them in their losing battle against the IRS.

67.  Additionally, Defendants Shankman and Abramov were Plaintiffs' trusted financial advisors – Plaintiffs' fiduciaries. Defendant Shankman and Abramov owed certain fiduciary duties to Plaintiffs – including but not limited to, the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing (which extends to dealings with those whose interest are closely identified with those of the fiduciary), duty of full disclosure, and duty to act with integrity of the strictest kind. Defendants Shankman and Abramov concealed or failed to disclose the material facts which they had a duty to disclose.

68.  Plaintiffs relied on Defendants Shankman, Abramov, Hartstein, ECI, Burke and Pension Strategies' misrepresentations and omissions when making their decision to initially participate in the Plan and to continue to stay in the Plan each year thereafter. Plaintiffs also relied on each of these misrepresentations and omissions with respect to the maintenance of their Plan and the IRS reporting requirements regarding the Plan.

69.  The conduct of Defendants, as set forth herein, constitutes fraud thereby causing Plaintiffs damages for which they sue. Accordingly, Plaintiffs are entitled to recover their actual damages as well as punitive or exemplary damages from Defendants.

## SECOND CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENTATION
## (BY PLAINITFFS AGAINST ALL DEFENDANTS)

- 27 -

70.   Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

71.   In the alternative if the same is necessary, Defendants, individually and through their agents, and in conspiracy with one another, aided and abetted one another in negligently making false representations to Plaintiffs with the intention that Plaintiffs rely thereon in entering into the Plan and continuing to stay in the Plan. Defendants (1) made assertions of untrue facts; (2) which Defendants represented that they believed to be true; (3) with the lack of a reasonable ground for that belief; (4) Defendants intended to induce Plaintiffs' reliance upon the representations; (5) Plaintiffs' justifiably relied upon the representations; and (6) that resulted in damages for which Plaintiffs now sue.

72.   Defendants, and each of them, sold an investment based on false representations as described above. Defendants, and each of them, concealed material facts and thereby misled Plaintiffs as described above. The conduct of Defendants, as set forth herein, constitutes negligent misrepresentation thereby causing Plaintiffs damages for which they sue.

73.   The Defendants did not exercise reasonable care or competence in obtaining or communicating the information contained in these false representations. Plaintiffs justifiably relied on each of these representations and omissions by the Defendants. If Plaintiffs had been told the truth, they would not have participated in the investment. Plaintiffs would have invested in a legitimate retirement plan that provided the desired tax savings or invested in more equipment for Plaintiffs' company which would have provided the desired tax savings of a legitimate business expense.

- 28 -

74. The negligent misrepresentations by the Defendants proximately caused the damages suffered by Plaintiffs. Accordingly, Plaintiffs are entitled to recover their actual damages.

### THIRD CAUSE OF ACTION
### FOR BREACH OF FIDUCIARY DUTY
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

75. Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

76. All Defendants owed Plaintiffs a fiduciary duty to recommend a suitable investment that met Plaintiffs' investment objectives and to keep Plaintiffs apprised of all relevant facts relating to their investment in their 412(i) plan. Defendants breached both common law and statutory fiduciary duties to Plaintiffs by a) recommending that Plaintiffs participate in the 412(i) plan, even though it was not suitable for their investment objectives and involved an excessive amount of insurance; b) making the above-described misrepresentations and omissions; c) misrepresenting the tax consequences of the 412(i) plan; d) failing to disclose the tax risks associated with the 412(i) plan; and e) failing to disclose the Shankman and Abramov's inherent conflict in recommending that Plaintiffs' invest in a plan that will pay them a sizeable commission for Plaintiffs' participation. Defendants' breach of their fiduciary duties are a producing cause of the Plaintiffs' damages.

77. Additionally, a special relationship of trust and confidence existed between Plaintiffs and Defendants Shankman and Abramov as Plaintiffs had engaged Defendants Shankman and Abramov to act as Plaintiffs' trusted financial advisors. As Plaintiffs' trusted financial advisors, Defendants Shankman and Abramov owed Plaintiffs a fiduciary duty to recommend a suitable investment that met Plaintiffs' investment objectives and to keep Plaintiffs

apprised of all relevant facts relating to their investment in the 412(i) Plan. In addition to the breaches alleged against all Defendants, Defendants Shankman and Abramov owed certain fiduciary duties to Plaintiffs – including but not limited to, the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing (which extends to dealings with those whose interest are closely identified with those of the fiduciary), duty of full disclosure, and duty to act with integrity of the strictest kind. Defendants Shankman and Abramov breached those fiduciary duties by making the misrepresentations and omissions outlined in Plaintiffs' fraud cause of action. Defendants Shankman and Abramov's respective breaches of their fiduciary duties are a producing cause of the Plaintiffs' damages.

## FOURTH CAUSE OF ACTION
### FOR NEGLIGENCE
### (BY PLAINITFFS AGAINST ALL DEFENDANTS)

78. Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

79. As described herein, and in the alternative if the same be necessary, Defendants individually and through their agents were negligent. Defendants owed Plaintiffs a duty to act as a reasonable and prudent insurance agent, financial advisor, insurance advisor, promoter, and/or administrator. Defendants breached their duty by making the above-referenced representations and omissions. Defendants' breach proximately caused the occurrences in question and Plaintiffs' damages.

80. Defendants represented to Plaintiffs that they had special expertise regarding 412(i) plans. Plaintiffs, in turn, justifiably relied upon Defendants to provide them with advice and services related to 412(i) plans and the tax deductions associated with such plans.

81.   Defendants owed Plaintiffs a duty to perform these services in a manner conforming to the professional standards of care applicable to insurance agents, financial advisors, insurance advisors, promoters, and/or administrators.

82.   Defendants negligently failed to adhere to these professional standards in, *inter alia*, the following ways:

a)   Having insufficient expertise in §412(i) Plans to accurately analyze the structure of the investment in order to determine whether, in reasonable probability, tax deductions for contributions into the 412(i) Plan would be allowed by the IRS;

b)   Accepting representations about the character and operation of the 412(i) Plan without performing their own adequate investigation of the 412(i) Plan;

c)   Recommending that the Plaintiffs invest in the 412(i) Plan when they knew or should have known that they lacked the expertise/information about the 412(i) Plan to make an informed decision about the merits of the 412(i) Plan;

d)   Failing to adequately advise the Plaintiffs of the substantial tax and investment risk associated with investing in the 412(i) Plan;

e)   Failing to adequately perform, inform, and/or disclose an independent analysis or due diligence regarding the propriety or viability of the 412(i) Plan or the insurance policy that were marketed to Plaintiffs;

f)   Failing to adequately perform, inform, and/or disclose an independent analysis or due diligence regarding whether the 412(i) Plan that was marketed to Plaintiffs was in compliance with the applicable sections of the Internal Revenue Code;

g)   Failing to adequately review the IRS announcements, notices, and statements regarding 412(i) plans, or the use of life insurance policies to fund such plans;

h)   Representing that the 412(i) Plan marketed to Plaintiffs was in compliance with the applicable sections of the Internal Revenue Code;

i) Failing to adequately perform, inform, and/or disclose an adequate independent analysis or due diligence regarding whether the contributions to the 412(i) Plan were tax deductible;

j) Representing that the contributions to the 412(i) Plan were tax deductible;

k) Failing to adequately disclose the known risks related to the 412(i) Plan that they marketed to Plaintiffs;

l) Failing to disclose to Plaintiffs the significant commissions that agents were earning with respect to the insurance products sold to Plaintiffs;

m) Failing to adequately disclose that there were significant tax risks associated with funding the 412(i) Plan with the insurance products;

n) Failing to adequately disclose that Plaintiffs' investment in the 412(i) Plan would virtually guarantee that they would be audited by the IRS, that they would incur substantial expense in defending the audit and that they would ultimately lose the audit and not only have to pay taxes on the sums previously invested, but also interest and penalties;

o) Failing to adequately disclose that professional advisors for certain Defendants had expressly warned them about such risks and advised them not to market these insurance policies for use in a 412(i) plan;

p) Failing to adequately disclose that the 412(i) Plan was likely to be deemed abusive by the IRS; and

q) Failing to adequately disclose that the IRS had issued numerous announcements and notices over the years addressing many of the same characteristics of this 412(i) Plan and explaining that such characteristics are contrary to federal tax laws and regulations.

83. As a direct and proximate cause of Defendants' negligence, Plaintiffs participated and invested in the plan. As a direct and proximate result of their participation in the plan and Defendants' negligence, Plaintiffs have suffered damages as described below.

## FIFTH CAUSE OF ACTION FOR UNJUST
### ENRICHMENT (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

84.  Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

85.  Defendants obtained funds and profits from the Plaintiffs by fraud perpetrated by the Defendants and the taking of undue advantage of the Plaintiffs in the manner described above.  Defendants' conduct gives rise to a cause of action on behalf of Plaintiffs under the equitable remedy of unjust enrichment, which cause of action is hereby stated.

## SIXTH CAUSE OF ACTION FOR MONEY HAD AND RECEIVED
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

86.  Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

87.  Defendants obtained money from Plaintiffs which in equity and good conscience belongs to Plaintiffs.  Said actions of Defendants give rise to a cause of action on behalf of Plaintiffs under the equitable theory of money had and received, which cause of action is hereby stated.

## SEVENTH CAUSE OF ACTION
## FOR VIOLATION OF THE CONSUMER FRAUD ACT
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

88.  Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

89.  The conduct of Defendants as alleged above are all in violation of N.J.S.A 56:8-1, *et. seq.* ("Consumer Fraud Act").  Said violations resulted in an ascertainable loss of money and/or property to Plaintiffs.  Specifically, Defendants engaged in unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, or the knowing,

concealment, suppression, or omission of material facts, as discussed thoroughly above, with the intent that Plaintiffs rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise as that term is defined by the Consumer Fraud Act.

90.   Plaintiffs further sue for trebling of these damages and for reasonable attorneys' fees, filing fees, and costs of court pursuant to N.J.S.A. 56:8-19.

## EIGHTH CAUSE OF ACTION
## FOR VIOLATION OF THE NEW JERSEY CIVIL RICO STATUTE
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

91.   Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at length.

92.   The conduct of Defendants, as alleged above, is in violation of N.J.S.A 2C:41-1, *et. seq.* ("RICO") in that (a) there was unquestionably an enterprise, (2) that the enterprise engaged in or its activities affected trade or commerce, (3) that Defendants were employed by, or were associated with the enterprise, (4) that Defendants participated in the conduct of the affairs of the enterprise, and (5) that Defendants participated through a pattern of racketeering activity. The predicate acts of Defendants' enterprise include acts in violation of 18 USCS §1341 (pertaining to mail fraud).

93.   Defendants devised this insurance scam to defraud and deprive Plaintiffs of their hard earned money and to unjustly enrich Defendants. Defendants executed this scheme by utilizing the United States Post Office to send Plaintiffs executed plan documents, the insurance policy used to fund the 412(i) Plan, bills and statements for contribution amounts or administrative fees owed as a result of participation in the 412(i) Plan.

94.   Such violations resulted in damages to Plaintiffs. Plaintiffs are therefore entitled to recover their damages, treble damages, costs of suit, and reasonable attorney's fees.

## NINTH CAUSE OF ACTION
## FOR BREACH OF CONTRACT
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

95.  Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at

length.

96.  There was and is a valid and enforceable agreement between Parties for Defendants

to sell and Plaintiffs to buy legitimate insurance products.

97.  Plaintiffs performed their obligations under the agreements, and were not and are

not in breach thereof.

98.  Defendants breached the agreement by selling, unbeknownst to Plaintiffs,

illegitimate insurance plans to Plaintiffs.

99.  As a result of the breaches by Defendants, Plaintiffs have suffered damages.

## TENTH CAUSE OF ACTION
## FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

100. Plaintiffs repeat the allegations of the preceding paragraphs as if set forth herein at

length.

101. In every contract there is imposed by law upon the parties an implied duty of good

faith and fair dealing.

102. As described above, Defendants breach the implied duty of good faith and fair

dealing causing Plaintiffs considerable damages.

## PRAYER

**WHEREFORE,** Plaintiffs demand judgment against Defendants to recover damages for

the following items:

(1)  Contributions paid to the Plaintiffs' 412(i) Plan;

(2)  Administrative fees paid to the Plaintiffs' Plan;

- 35 -

(3)    Professional Fees paid by the Plaintiffs to defend themselves against the IRS audit and to terminate the 412(i) Plan;

(4)    Back Taxes and Interest owed to the IRS resulting from Plaintiffs' contributions to the Plan;

(5)    Accuracy related penalties and 6707A Penalties owed to the IRS resulting from Plaintiffs' contributions to the Plan;

(6)    Interest on the investment;

(7)    Disgorgement of the Defendants' profits;

(8)    Compensatory and consequential damages;

(9)    Mental Anguish Damages;

(10)   Prejudgment and post-judgment interest;

(11)   Costs of Court;

(12)   Punitive or Exemplary Damages

(13)   Treble damages pursuant to the Consumer Fraud Act and the Civil RICO statute;

(14)   Attorney's Fees; and

(15)   Such other and further items of damages and relief as the Court may deem just and equitable.

## DESIGNATION OF TRIAL COUNSEL

Plaintiffs designate Arthur "Scott" L. Porter, Jr. as its trial counsel. Pending their admission to this Court pro hac vice, Plaintiffs also designate Dalton Harris, Austin England and Laura Richards Sherry as trial counsel.

## RULE 4:5-1 CERTIFICATION

The matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no other action or arbitration proceeding is contemplated. Plaintiff is not aware of any other person who should be joined in this action.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

FISCHER PORTER & THOMAS, P.C.
*Attorneys for Plaintiffs*

Dated: August 28, 2013

_____

Arthur "Scott" L. Porter, Jr.
Managing Member
Direct Dial: 201-308-8096
aporter@fpt-law.com

Of Counsel:
Dalton D. Harris III
Austin England
Laura Richards Sherry
THE HARRIS FIRM, P.C.
5050 West Lovers Lane
Dallas, Texas 75209
Telephone:     (214) 956-7474
Telecopier:    (214) 956-7405
dalton@lawstop.com
austin@lawstop.com
laura@lawstop.com

- 37 -